IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROGER GARCIA, JR., | § | |
| Plaintiff, | § § § | |
| V. | § § | CIVIL ACTION NO. H-18-1952 |
| ANDREW SAUL[1], COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | § § § § § | |
| Defendant. | § § | |

## AMENDED[2] MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court[3] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 7) and Defendant's Cross Motion for Summary Judgment (Document No. 9). After considering the cross motions for summary judgment, each side's Response to the other's Motion for Summary Judgment (Document Nos. 11 & 12), the administrative record, the written decision of the Administrative Law Judge dated April 24, 2017, and the applicable law, the Court ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is GRANTED, Defendant's Motion for Summary Judgment is DENIED, and this matter is REMANDED to the

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration.

[2] This Amended Memorandum and Order is solely entered to correct an inaccuracy in the background section. No substantive changes have been made.

[3] On December 3, 2018, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 10.

Commissioner for further proceedings, including a determination of whether Plaintiff was ever, during the five year period under consideration, disabled.

I.  **Introduction**

Plaintiff Roger Garcia, Jr. ("Garcia") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance benefits. Garcia argues in this appeal that: (1) the ALJ erred in considering whether he is illiterate; (2) substantial evidence does not support the ALJ's determination that he does not meet or equal Listing 1.04; (3) substantial evidence does not support the ALJ's RFC determination; (4) the ALJ erred in failing to obtain an updated medical opinion; (5) the ALJ erred when he failed to make a determination about whether Garcia could maintain competitive employment; and (6) the ALJ erred in his consideration of, and his failing to develop the record about, Garcia's obesity. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's April 24, 2017, decision, that the decision comports with applicable law, and that the decision should be affirmed.

II.  **Procedural History**

On September 16, 2014, Garcia applied for disability insurance benefits, claiming that he was unable to work since September 22, 2008, as a result of neck, back and shoulder impairments. The Social Security Administration denied his application at the initial and reconsideration stages. After that, Garcia requested a hearing before an ALJ. The Social Security Administration granted his

2

request and an ALJ, Janice M. Bruning, held a hearing on January 25, 2017, at which Garcia's claims were considered *de novo*. (Tr. 29-56). On April 24, 2017, the ALJ issued his decision finding Garcia not disabled. (Tr. 12-22).

Garcia sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 416.1470. On May 23, 2018, the Appeals Council found no basis for review (Tr. 1-4), and the ALJ's April 24, 2017, decision thus became final. Garcia seeks, with this proceeding filed pursuant to § 405g, judicial review of that final, adverse administrative decision.

The parties have filed cross motions for summary judgment (Document Nos. 7 & 9), which have been fully briefed and are ripe for ruling. At issue in this appeal is the determination that Garcia was not disabled between September 22, 2008, Garcia's alleged onset date, and December 31, 2013, the date Garcia was last insured for purposes of disability insurance benefits.

### III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

3

be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

5

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step one that Garcia had not engaged in substantial gainful activity since September 22, 2008, his alleged onset date. At step two, the ALJ determined that Garcia had the following severe impairments: a spinal disorder, a left shoulder disorder, and obesity. At step three, the ALJ determined that Garcia did not have an impairment or a combination of impairments that met or equaled a listed impairment, including Listings 1.02, 1.04, 11.14 and 14.09. Prior to consideration of steps four and five, the ALJ determined that Garcia had the "residual functional capacity to perform light work . . . except [he cannot] climb ladders, ropes or scaffolds, and he [can] no more than occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend, or twist [ ] and [can] reach overhead no more than occasionally with his left upper extremity and use his left hand no more than frequently to handle, finger or feel [ ] [and] should avoid concentrated exposure to extreme cold." (Tr. 17). Using that residual functional capacity assessment, the ALJ concluded,

at step four, that Garcia could not perform his past relevant work as a sewer tapper. At step five, using that same residual functional capacity assessment, and relying on the testimony of a vocational expert, the ALJ concluded that there were jobs in significant numbers in the regional and national economy that Garcia could perform, including production assembler, housekeeping cleaner, and cafeteria attendant, and that he was therefore, through December 31, 2013, the date he was last insured for disability insurance purposes, not disabled.

In this appeal, Garcia maintains that the ALJ erred in his consideration and development of the record as to his illiteracy and his obesity, erred in failing to obtain an updated expert medical opinion, and erred in failing to make a determination that Garcia could maintain employment. Garcia also maintains that substantial evidence does not support the ALJ's finding at step three that he did not meet Listing 1.04, and that substantial evidence does not support the ALJ's RFC determination.

## V. Discussion

The objective medical evidence shows Garcia's spinal disorder and his left shoulder disorder have their genesis in a work-related accident that occurred on September 22, 2008, when a load of dirt was dumped on him. That accident led to three different surgeries over a period of four years: one on Garcia's cervical spine on March 5, 2009; one on Garcia's left shoulder on January 9, 2010; and one on Garcia's lumbar spine on March 8, 2012. Two of those surgeries – those on Garcia's cervical and lumbar spine – were performed by Dr. Michael Malek, a neurosurgeon, and the other – on Garcia's left shoulder – was performed by Dr. Ellis Nam. Dr. Malek's course of treatment of Garcia, over a four year period of time, is summarized by Dr. Malek in the latest of his progress

notes, dated August 12, 2013, as follows:

> The patient's condition is stable, however his pain persists and requires intermittent medication. He did have a cervical fusion and has done relatively well, however he continues to have multiple other problems with disc herniation at the L5-S1 and L4-5 level. The patient had the L5-S1 fusion and had shoulder surgery as well. The only occupation he ever had was construction. Given his educational level, his age, his skill set as well as the current employment market, I do not believe there is any chance whatsoever of Mr. Garcia being employable. His restrictions with respect to the neck, back and the shoulder make any return to work extremely difficult. The only thing that helps him from the low back standpoint is sitting, however sitting he cannot do because of problems with his neck and not being able to operate his arm and lift his arm. Therefore, the patient, in my opinion, given the combination of conditions, is restricted from any employment.
>
> **Diagnosis:**
> 1. S/P work injury 9/22/08
> 2. Left cervical radiculopathy clinically in both upper and lower cervical distribution
> 3. MRI scan of the cervical spine done 12/23/08 showing evidence of central disc protrusion at C3-4, left paramedian disc protrusion indenting the thecal sac with moderate spinal stenosis at C4-5, diffuse disc bulge at C5-6, by report, films not available
> 4. Partial response to physical therapy
> 5. Limited response to activity restriction
> 6. No known drug allergies
> 7. S/P cervical ESI [epidural steroid injections]1/9/09 with good, but partial response
> 8. S/P cervical ESI 1/23/09 with limited response
>
> \* \* \*
>
> 10. Films reviewed dated 12/23/08 with pathology primarily at C3-4, C4-5
> 11. Progression of symptoms
> 12. Delay in authorization is adversely affecting the outcome
> 13. S/P C3-4, C4-5 ACDF 3/5/09 with Kinetic Lifespine plate & screw instrumentation using 14 mm screws and PEEK cages 8 mm high x 2
> 14. Excellent initial clinical and radiographic results
> 15. Suspicion of triceps rupture
> 16. Continued good clinical results
> 17. Persistent low back pain
> 18. Positive response to therapy
> 19. Continued good clinical results
> 20. X-ray cervical spine 6/1/09 showing good progression of the fusion, good placement of the metal
> 21. Headache, memory difficulty

8

22. Intolerance to physical therapy
23. CT scan of the soft tissue of the neck done 7/10/09 showing no soft tissue masses
24. MRI of the brain done 7/10/09 showing no acute distress
25. Residual soft tissue pain
26. Physical therapy x 3 weeks with positive response
27. X-ray of the cervical spine done 9/10/09 showing post-operative changes, cannot assess progression of fusion
28. X-ray of the left rib done 9/10/09 suspicious for left T11 fracture, suspicious for healing T11 rib fracture anteriorally
29. Physical therapy underway
30. CT scan of the cervical spine 10/9/09 showing good fusion, no failure of the hardware, but sagittal reconstruction was not done
31. MRI scan of the cervical spine done 10/1/09 showing no next level disease
32. Spinal aggravation with weather changes and work overhead
33. Shoulder arthroscopy clearance requested
34. Reconstructed CT scan done 10/9/09, films not available
35. CT scan with sagittal reconstruction done 10/9/09 reviewed with excellent fusion (11.6.09)
36. Physical therapy proceeding at a pace patient is not able to tolerate (5.27.10)
37. Intolerance to physical therapy pace (6.18.10)
38. S/P shoulder surgery per Dr. Nam (7.23.10)
39. Pain, burning in arm (7.23.10)
40. S/P eval per Dr. Nam with recommendation for FCE scheduled 7/31/10 (7.30.10)
41. X-ray of the cervical spine done 7/23/10 looks excellent (7.30.10)
42. FCE [functional capacity evaluation] done 7/31/10 valid placing the patient in the medium strength category, not meeting the requirements of his job the in heavy strength category (8.13.10)
43. Lumbar radiculopathy, clinically in lower lumbar distribution, with preponderance of back pain, primarily left sided (9.17.10)
44. FCE reviewed by patient and wife with statement that there are inconsistencies between the report and what was done (9.17.10)
45. MRI scan of the lumbar spine done 10/6/10 shows evidence of large disc herniation at L5-S1 with moderate to severe bilateral neuralforaminal narrowing and moderate spinal stenosis (10.15.10)
46. EMG/NCV BLE done 10/6/10 shows evidence of lumbar radiculopathy L4-S1 nerve root (10.15.10)
47. S/P caudal ESI, left L5-S1 transforaminal 11/19/10 with partial response (12.3.10)
48. Persistence of symptoms (1.7.11)
49. Progression of symptoms to a level patient is not willing or capable of living with (1.14.11)
50. S/P lumbar discography on 1/21.11 valid and positive at L4-5 with evidence

|  | of Grade IV tear at that level and provocatively it was positive with the L5-S1 disc calcified, disc was punctured with moderate to severe foraminal stenosis at that level, L3-4 level served as the control level (1.28.11) |
|---|---|
| 51. | Surgery education materials provided (1.28.11) |
| 52. | S/P IME [independent medical examination] 2/4/11 at Loyola, report not available (2.4.11) |
| 53. | Persistence of symptoms (4.29.2011) |
| 54. | Symptoms are at a level the patient is not willing or capable of living with (6.17.11) |
| 55. | IME Dr. Ghanayem 2/4/11 REVIEWED, biased in my opinion, not reflective of the patient's condition (2.10.12) |
| 56. | Progression of symptoms over past 3 days to incapacitating level, unable to function (2.24.12) |
| 57. | MRI scan of the lumbar spine done 2/14/12 REVIEWED showing evidence of dessication primarily at L5-S1, L4-5 seeks okay (3.2.12) |
| 58. | S/P IME, report not available (3.2.12) |
| 59. | S/P L5-S1 fusion 3/8/12 with Lifespine Conquest rid & screw instrumentation 7.5 x 50 at L5 and 7.5 x 45 at S1 bilaterally with Peek cages 10mm high x 2 (3.16.12) |
| 60. | Excellent initial clinical and radiographic results (3.16.12) |
| 61. | Lumbar spine plain films done 4/20/12 look excellent with good fusion on either side and good position of cage/screws (4.20.12) |
| 62. | S/P xray of the lumbar spine done today look excellent (6.15.12) |
| 63. | IME by Dr. Matthew Ross with diagnosis of disc herniation at L5-S1 and possibly L4-5 and related discogenic pain with recommendation for surgical fusion at L405 and L5-S1 (6.15.12) |
| 64. | S/P completion of 15 sessions of physical therapy with good response (6.15.12) |
| 65. | S/P completion of 24 sessions of therapy with residual pain with increased activity (7.20.12) |
| 66. | Persistence of symptoms primarily related to de-conditioning (8.24.12) |
| 67. | Work conditioning program x 4 weeks recommended with only one 4-hour day approved (8.24.12) |
| 68. | FCE done 8/28/12 placed him in the light physical demand level with lift and carry of 20 lbs (9.14.12) |
| 69. | Condition stable with good response to treatment (4.30.13) |
| 70. | Residual symptoms (7.15.13) |
| 71. | Residual symptoms, stable (8.12.13) |

(Tr. 472-75). This summary is consistent with the contents of Dr. Malek's individual, preceding progress notes.

As for Garcia's shoulder disorder, the objective medical evidence shows that he was

10

diagnosed by Dr. Ellis Nam with left shoulder impingement syndrome in July 2009. At his initial visit, Dr. Nam found "severe tenderness along the AC joint, which is reproduced with cross-chest adduction. Forward flexion of 160 degrees with extreme pain, abduction of 110 degrees, external rotation of 45 degrees, and internal rotation to T10. Mild tenderness along the proximal biceps tendon with positive impingement signs. Rotator cuff strength testing is 4/5 with pain. Positive O'Brien's test." (Tr. 319). Following his diagnosis of "left shoulder impingement syndrome with AC joint inflammation," Dr. Nam treated Garcia with physical therapy and cortisone injections, until he performed an arthroscopic superior labral repair, a subacromial decompression and a distal claviculectomy on Garcia's left shoulder on January 9, 2010. (Tr. 282-83). Following surgery, Garcia again participated in physical therapy, but his left shoulder pain persisted until at least July 2010 (Tr. 308-314). By April of 2012, however, Garcia reported that his left shoulder was functioning fine, and that he only had left shoulder pain from "time to time." (Tr. 316).

The objective medical evidence in the record from the progress and treatment notes of Dr. Malek and Dr. Nam does not support the ALJ's determination that "The claimant was not under a disability, as defined in the Social Security Act, *at any time* from September 22, 2008, the alleged onset date, through December 31, 2013, the date last insured." (Tr. 22) (emphasis added). Instead, the objective medical evidence suggests, and may even indicate, that there was at least one period of time, if not two, when Garcia's neck, shoulder and back impairments may have met an applicable listing, including Listing 1.04, if the ALJ had considered Garcia's impairments longitudinally, and not merely as background evidence of Garcia's condition as of December 2013, when Garcia was last insured. Dr. Malek's treatment notes related to Garcia's back impairments span the period of September 2010 to August 2013. From September 2010 to March 2012, a period of eighteen

11

months, Garcia had epidural spinal injections and numerous diagnostic procedures – all of which indicated "severe" spinal stenosis, at one level or more. On March 16, 2012, when surgery was finally approved, Malek performed a L5-S1 fusion with instrumentation, with Dr. Malek describing part of the procedure in his operative report as follows:

> Initially, bilateral L5-S1 laminotomy was done with partial medial facetotomy, attempting to preserve the facet and to do a decompression. However, the lateral recess was completely calcified, and the foramen were completely calcified, requiring work with 1-mm and 2-mm Kerrison rongeurs in order to open the foramen, with the lateral edges of the disk merging with the facet at S1, pinning the exiting L5 nerve root between the pedicle of L5, the calcified disk emerging with the facet at S1, and the posterior hypertrophic facet.
>
> That was extremely tedious, lengthy work in order to do an adequate decompression requiring medial facetectomy, osteotomy of the lateral spurs at L5-S1 until complete decompression and complete foraminectomy was performed and the nerve root was decompressed anteriorly and posteriorly. After that was done, the transverse processes of the L5 and the ala of the sacrum were decorticated, and pedicle screws of the above dimensions were placed at L5-S1 bilaterally, each pedicle being sounded internally and externally prior to introduction of screws, externally after introduction of the screws after the x-rays were taken.
>
> After that was done, bilateral L5-S1 diskectomy was performed. The disk was calcified partially, and complete decompression was performed across the midline, the disk herniation removed, and the end-plates were curetted and prepared for grafting.

(Tr. 505). Garcia's post-surgery recovery, which included physical therapy and a work conditioning program, lasted until August 2012. It was only thereafter, throughout 2013, that Garcia's lumbar impairment was considered "stable."

The objective medical evidence in the record, at least that related to Garcia's lumbar impairment, cannot be squared with the ALJ's conclusion that Garcia was not disabled "at any time" between September 22, 2008, and December 31, 2013. Given Garcia's three successive surgeries, one on his neck in 2009, one on his left shoulder in 2010, and one on his lumbar spine in March

2012, the ALJ should have considered whether Garcia's condition met or equaled Listing 1.04 at any time between September 22, 2008, and December 31, 2013, and whether Garcia was unable to engage in any substantial gainful activity for any twelve month period of time in and around those three surgical procedures.[4] Because the ALJ did not consider whether Garcia, for *any* twelve month period of time between September 2008 and July 2012, could have been considered disabled at step three and/or step five, the ALJ's decision cannot be said to be supported by substantial evidence. While the objective evidence in the record *may* indicate, and support, the ALJ's determination that Garcia was not disabled on December 31, 2013, his neck, shoulder and back problems having improved and become stable by that time, it does not support the ALJ's determination that Garcia was not disabled "at any time."[5]

In addition, the expert medical opinions in the record from Dr. Malek, while properly discounted by the ALJ because they were based, at least in part, on vocational factors, such as Garcia's age, his skill level, and "market conditions," do not support the ALJ's determination that Garcia was not disabled "at any time" between September 22, 2008 and December 31, 2013. During

---

[4] Listing 1.04(A) provides for presumptive disability where there is "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and spine)." Here, given the contents of Dr. Malek's March 2012 operative report as well as the physical examination and the nerve conduction study findings of October 6, 2010 (Tr. 272-273), Garcia met most of the requirements of Listing 1.04A, with the only exception being the absence of a positive straight leg raising test.

[5] All of Garcia's other arguments relate primarily to the ALJ's determination that he was not disabled on December 31, 2013, the date he was last insured. While some of his arguments are patently without merit, some of the others are intertwined with the ALJ's assessment of the evidence in the record over the five year period under consideration, and will not be addressed at this time given the clear record that substantial evidence does not support the ALJ's determination that Garcia was not disabled "at any time."

13

his course of treatment of Garcia, Dr. Malek consistently instructed Garcia to remain off work, and opined, on numerous occasions that Garcia's impairments rendered him not "employable." While Garcia was found by Dr. Malek to have reached maximum medical improvement in September 2012 (Tr. 468-471), there is no expert opinion evidence from Dr. Malek, or anyone else, that Garcia was, prior to that time, able to engage in substantial gainful activity. The ALJ's reliance on the opinion of a State Agency medical consultant is also problematic. The State Agency medical consultant, Dr. Leonore Gonzalez, opined in July 2015 that Garcia, "for" the date he was last insured (December 31, 2013), had the residual functional capacity to lift and carry 20 pounds occasionally, and 10 pounds frequently, and walk, stand and sit for 6 hours in an 8 hour day (Tr. 78-80) – an opinion that is generally consistent with the RFC determination made by the ALJ. Where that expert medical opinion is lacking is in support for the ALJ's determination that Garcia was not disabled "at any time" between September 22, 2008 and December 31, 2013. Nowhere did Dr. Gonzales opine about Garcia's residual functional capacity over the five year period of time at issue – from September 22, 2008 through December 31, 2013.

Here, the record shows that Garcia suffered substantial injuries related to the work accident he suffered in September 2008, and that he underwent three significant surgical procedures over a four year period of time. That evidence in the record may, if properly considered, support a favorable disability determination, at least for some closed period of time. Because the ALJ did not consider this, it cannot be said that the ALJ's opinion, that Garcia was not disabled "at any time" between September 22, 2008 and December 31, 2013, is supported by substantial evidence.

## VI. Conclusion and Order

Based on the foregoing, and the conclusion that substantial evidence does not support the ALJ's determination that Garcia was not disabled "at any time" between September 22, 2008 and December 31, 2013, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 7) is GRANTED, Defendant's Motion for Summary Judgment (Document No. 9) is DENIED, and this case is REMANDED to the Social Security Administration pursuant to 42 U.S.C. § 405g, for further proceedings consistent with this opinion.

Signed at Houston, Texas, this 12th day of September, 2019.

*Frances H. Stacy* (signature)

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE